UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
RLS ASSOCIATES, LLC,                      :
                                          :
                      Plaintiff,          :        01 Civ. 1290 (CSH) (DF)
                                          :
         -against-                        :
                                          :        MEMORANDUM OPINION
UNITED BANK OF KUWAIT PLC,                :             AND ORDER
                                          :
                      Defendant.          :
------------------------------------------------------------ x
```

HAIGHT, Senior District Judge:

In this diversity action, plaintiff RLS Associates, LLC ("RLS") alleges that defendant United Bank of Kuwait PLC ("UBK" or "the Bank") breached a contractual agreement to pay a post-termination fee. RLS, a United States-based limited liability company, performed consulting services for UBK, a London-based banking corporation, until UBK terminated the consulting relationship in February 2000. RLS contends that, under the terms of the consultation contract, it was entitled to an additional year's worth of consulting fees following the termination. This seemingly straightforward breach of contract claim has given rise to a number of complicated litigation issues — including the Bank's present motion to dismiss the action for plaintiff's failure to post a bond to secure costs and attorneys' fees.

In light of the cost bond's critical role in this litigation, this Opinion revisits several issues related to UBK's motion to dismiss: (1) whether the English rule on attorneys' fees applies in this case, (2) whether the Court should require RLS to post a bond in any amount, and (3) if so, the appropriate amount for the bond.

For the reasons set forth below, I hold that the English rule on attorneys' fees applies, that

a cost bond is justified, and that the amount of the bond should be reduced to $75,000.  Furthermore, I direct UBK to post a bond, also in the amount of $75,000.

## I.  BACKGROUND

### A.   Relevant Procedural History

In its March 11, 2005 Opinion, this Court found that Local Civil Rule 54.2 entitled UBK to a bond to be posted by RLS because "UBK has an understandable concern regarding RLS's real ability to pay any eventual attorneys' fees or costs, should UBK prevail in this case."  2005 WL 578917, at *2 (S.D.N.Y. Mar. 11, 2005).  The record indicated that RLS had no assets.  Furthermore, the Court noted that "since the English Rule applies, attorneys' fees are included in the recoverable costs, and so the amount involved is potentially significant."  *Id.* at *4.  In a subsequent opinion, the Court set the bond amount at $469,500, which incorporated attorneys' fees that UBK could potentially recover under the English fee-shifting rule if UBK prevailed in the litigation.  I based that amount principally upon the affidavit of a leading English "law costs draftsman," whose calculations were not persuasively challenged by RLS.  *See* 2005 WL 3312004, at *2 (S.D.N.Y. Dec. 7, 2005).

RLS failed to post the bond, and the Bank moved for dismissal.  RLS argued that dismissal was inappropriate — indeed, barred by the Second Circuit's opinion in *Selletti v. Carey*, 173 F.3d 104 (2d Cir. 1999) — because RLS lacked the financial resources to post the bond.[1]  In *Selletti*, the Second Circuit held that a district court abused its discretion when it dismissed an action for failure to post a bond without giving adequate consideration to the plaintiff's alleged inability to pay.  *Id.* at 111-13.  Guided by *Selletti*, this Court directed the plaintiff to file financial statements of RLS,

---

[1] In addition, plaintiff filed a motion for an order setting a prompt trial date and requiring the Bank to post security for costs and fees under Local Civil Rule 54.2.

Richard Swomley, and Elaine Swomley.  The record indicated that the Swomleys, husband and wife, were at the time the only equitable owners of RLS.  *See* 2006 WL 2495039 (S.D.N.Y. Aug. 29, 2006).

## B.   Financial Statements

The financial statements filed by the plaintiff indicate the followings facts.  First, RLS has no income and no assets.  In fact, the company has not generated any revenue since 2000.  Second, Richard Swomley has negative net income, with expenses exceeding income by $66,000 in 2006. He holds an investment account of $105,000 and retirement accounts totaling $886,500, but Richard Swomley asserts that these accounts would be subject to significant state and federal taxes — around 40 percent — if liquidated.  Third, Elaine Swomley has negative net income, with expenses exceeding income by $141,000 in 2006.  She holds net home equity of about $218,000.[2]  The Swomleys have liquidated investment and retirement accounts and taken out additional home mortgages to fund living expenses over the past several years.  *See* Affirmation of Michael S. Devorkin To File Financial Statements of RLS Associates, LLC, Richard Swomley, Elaine Swomley (dated Sept. 14, 2006).

The Bank, in response, argues that the Swomleys actually hold about $1.4 million to $1.8 million in assets — "more than enough assets to arrange for security [of $469,500]."  Def.'s Mem. in Further Resp. to Financial Disclosures (dated Nov. 1, 2006), at 4.

## C.   Summary of Issues

The immediate question before the Court is whether plaintiff's complaint should be

---

[2] In addition, plaintiff notes that Elaine Swomley's interest in RLS was marginal.  She was a 1% member of RLS until 1999, when she withdrew as a member.

dismissed for failure to post the bond required by the Court's December 7, 2005 Opinion and Order.

Given the importance of the bond issue, however, this Opinion revisits several related issues: (1)

whether the English rule on attorneys' fees applies in this case; (2) whether the Court should require

RLS to post a bond in any amount; and (3) if so, the appropriate amount for the bond.  The third

inquiry necessarily implicates (4) whether the bond requirement should look beyond the corporate

plaintiff, RLS, to the assets of Richard Swomley or Elaine Swomley; and (5) what bond amount

would appropriately balance the equitable interests at stake.[3]

## DISCUSSION

## II.  THE ENGLISH RULE ON ATTORNEYS' FEES

### A.     Background

RLS and the Bank entered into a set of Consultancy Agreements, which provide that the

contracts "shall be governed by and construed in accordance with the laws of England."  *See* 2003

WL 22801918, at *1 (S.D.N.Y. Nov. 24, 2003).  This Part of the Opinion considers whether the

English rule on attorneys' fees ("the English rule") applies to the current litigation as a result of this

choice of law clause.  Under the English rule, the prevailing party can generally recover its attorneys'

fees from the losing party.

The issue of attorneys' fees has become central to the litigation.  The Bank's anticipated legal

fees of $469,500 significantly exceed the amount of plaintiff's underlying claim, which is about

$275,000.  Furthermore, the Bank has twice rejected RLS's offer to drop the action for an exchange

---

[3] Although some of these questions were addressed and answered in prior Opinions, I
make no apology for revisiting them in this Opinion.  The requirement of a pre-trial bond for
costs rests within the trial court's discretion, which is informed in part by equitable
considerations.  The Chancellor in Equity should never shrink from changing a prior ruling if the
fairness of the proceeding is enhanced thereby.

of mutual releases.  As this Court has noted, "[t]he only discernible reason for the Bank's refusal is its hope of recovering from RLS, based upon the contractually governing English law, the very considerable amount of legal fees the Bank has incurred to date."  2006 WL 2495039, at *2 (S.D.N.Y. Aug. 29, 2006).  Therefore, the Court will examine this issue in greater detail.

### 1.     The Court's Previous Analysis

The Court's March 11, 2005 Opinion concluded that the English rule was "consistent with New York choice of law principles and prior precedent."  2005 WL 578917, at *4 (S.D.N.Y. Mar. 11, 2005).  I noted that: "Other courts have ruled in circumstances similar to the present case, that under New York choice of law principles, English laws allowing recovery of attorneys' fees by the prevailing party are applicable."  *Id.* at *3 (citing *Katz v. Berisford Int'l PLC*, 2000 WL 959721 (S.D.N.Y. July 10, 2000); *Csaky v. Meyer*, 1995 WL 494574 (S.D.N.Y. Aug. 18, 1994); *Browne v. Prentice Dry Goods, Inc.*, 1986 WL 6496, at *3 (S.D.N.Y. June 5, 1986)).  As a result, I took attorneys' fees into account when setting the bond amount under Rule 54.2.

In a subsequent opinion, I explained: "[A]lthough the cost bond UBK requests in the case at bar is much larger than those requested by the defendants in *Tri-Ex* [a case where the bonds requested by the defendants totaled $34,000], that is the inevitable consequence of the parties' agreeing that English law would govern.  Under the English rule the prevailing party is entitled to attorney's fees as part of the costs.  Presumably RLS perceived some benefit to itself when it agreed that the contracts in suit 'shall be governed by and construed in accordance with the laws of England,' but whether or not that is so, RLS accepted English law *cum onere*, and one of those burdens (to mix metaphors) has come home to roost."  2005 WL 3312004, at *3  (S.D.N.Y. Dec. 7, 2005).

5

2.      **The Parties' Arguments**

RLS contends that the Court's determination was mistaken and that the English rule should not apply because: "First, it is a fundamental principle of American and English law that absent some specific *substantive* English statute, an American court will not borrow an attorneys' fee provision. Second, there is no such statute in this case; attorneys' fees under English law are purely procedural. Thus, the choice of law clause in this contract does not, in fact, import English law on attorneys' fees."   Letter of Michael S. Devorkin to the Court (dated Oct. 3, 2006).[4]   RLS cites *Conte v. Flota Mercante del Estado*, 277 F.2d 664 (2d Cir. 1960), where the Second Circuit refused to apply an Argentine attorneys' fee statute that followed the English rule in an admiralty case with claims governed by Argentine law.   RLS also cites *Bensen v. American Ultramar Ltd.*, 1997 WL 317343 (S.D.N.Y. June 12, 1997), where the court characterized attorneys' fees as "procedural" under New York law and declined to import the English cost-shifting rule.   Pl.'s Mem. of Law in Opp'n to UBK's Mot. to Dismiss (dated June 9, 2006), at 21.

The Bank argues that the English Rule should apply because: "[T]he bond RLS seeks to avoid is the inevitable consequence of the parties agreeing that English law would govern.   Plaintiff knew this meant the losing party would pay attorney fees and it was the first to seek them on summary judgment."   Def.'s Mem. in Resp. to Financial Disclosures (dated Sept. 27, 2006), at 3 (citations and quotations omitted).   The Bank notes that in a brief prepared by predecessor counsel

---

[4] Mr. Devorkin, an able and experienced member of the Bar of this Court, did not represent RLS at the time of the Court's prior Opinions.   He was retained to do so by the former partners of the dissolved law firm that represented RLS at the inception of the case.   The circumstances resulting in Mr. Devorkin's retention are explained in this Court's Opinions reported at 417 F. Supp. 2d 417 (S.D.N.Y. 2006); 2006 WL 1085614 (S.D.N.Y. Apr. 24, 2006); and 2006 WL 2495039 (S.D.N.Y. Aug. 29, 2006).   In his most recent submissions on behalf of RLS, Mr. Devorkin advances arguments that prior counsel for RLS did not.

on an earlier summary judgment motion, RLS argued: "All of the Consultancy Agreements between RLS and UBK provide (at paragraph 18) that they 'shall be governed by and construed in accordance with the laws of England.'  Under English law, the prevailing party can recover its attorneys' fees from the losing party. . . .  As such, UBK is liable to RLS for the attorneys' fees incurred by RLS in this action."  Def.'s Reply Mem. in Supp. of Mot. to Dismiss with Prejudice (dated June 26, 2006), at 4 (quoting Pl.'s Mem. in Supp. of Summ. J. (dated May 16, 2003), at 7-9).

### 3.    Summary of Issues

Whether the English rule should be applied in this case raises the following issues: (1) whether, under the *Erie* doctrine in this diversity case, attorneys' fees are governed by state or federal law, (2) whether the contract clause selecting English law would be recognized under New York choice of law principles, and (3) if so, the scope of that choice of law clause — specifically, whether it includes the English rule for attorneys' fees.  As explained below, it is clear that attorneys' fees are governed by state law under the *Erie* doctrine, and that the contract clause selecting English law would be recognized under New York choice of law principles.  Thus, the key issue is whether the choice of law clause incorporates the English rule on attorneys' fees.  Because choice of law clauses only apply to substantive issues, the question becomes whether the English rule on attorneys' fees would be considered procedural or substantive under New York choice of law principles.

The primary substance-procedure framework adopted by the New York Court of Appeals labels issues relating closely to the underlying right as substantive and issues dealing with the remedy, or the means by which the right is enforced, as procedural.  Under this framework, I conclude that the English rule would be characterized as substantive.  In addition, the Court of Appeals has identified several policy considerations that underlie the substance-procedure

dichotomy, which relate to judicial efficiency, forum-shopping, fairness to all parties, and the public policy of New York. A balance of these considerations also weighs in favor of characterizing the English rule as substantive in this case.

## B.    The *Erie* Doctrine

This case is in federal court based on diversity jurisdiction. Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and its progeny, federal courts sitting in diversity apply federal procedural law and state substantive law. *See, e.g., Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). But the distinction between substance and procedure is sometimes unclear.

### 1.    Substance-Procedure Analysis under the *Erie* Doctrine

In *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), the Supreme Court announced an "outcome-determination" test, whereby a rule would be considered substantive under the *Erie* doctrine if it would "significantly affect the result of a litigation for a federal court to disregard [the state law]." *Id.* at 109. But this test has no clear stopping point; almost any procedural rule can have a significant effect on the outcome of a case. In *Hanna v. Plumer*, 380 U.S. 460 (1965), the Court refined and qualified the outcome-determination test. The Court explained that the outcome-determination test should be read with "reference to the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Id.* at 468.[5]

### 2.    Attorneys' Fees under the *Erie* Doctrine

A preliminary issue is whether, under the *Erie* doctrine, the Court should apply state or

---

[5] Thus, a court should ask "whether the application of the [state] rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against the citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court." *Id.* at 468 n.9.

federal law to attorneys' fees.  Two courts in the Southern District of New York have concluded that "[u]nder *Erie* principles, attorney's fees are considered substantive and [are] controlled by state law in diversity cases."  *Bensen v. Am. Ultramar Ltd.*, 1997 WL 317343, at *13 (S.D.N.Y. June 12, 1997) (quoting *Whiteside v. New Castle Mut. Ins. Co.*, 595 F. Supp. 1096, 1100 (D. Del. 1984), citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975)); *Katz v. Berisford Int'l PLC*, 2000 WL 959721, at *7 (S.D.N.Y. July 10, 2000).  *Bensen* and *Katz* cite the Supreme Court's opinion in *Alyeska*, which states: "[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed."  *Alyeska*, 421 U.S. at 259 n.31 (quotations and citations omitted).  Thus, attorneys' fees are considered substantive under the *Erie* doctrine, and should be analyzed under state law in diversity cases.

## C.    Framework of Analysis under New York Law

Since attorneys' fees are considered substantive for *Erie* purposes, the federal court should analyze the issue under the law of the forum state — in this case, New York.  But this does not necessarily mean that New York's own rule on attorneys' fees applies.  Rather, because there is a conflict of laws on the issue,[6] the federal court must apply New York *choice of law* rules to determine which attorneys' fees rule to use.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  In other words, the Court must determine whether a New York court would apply the English rule on attorneys' fees based on the choice of law clause in the contracts between RLS

---

[6] There is a clear conflict of laws on the issue because New York follows the American rule, which unlike the English rule does not allow the prevailing party to recover attorneys' fees unless there is a specific statutory or contractual right to such fees.

9

and the Bank.

Under New York choice of law rules, it is clear that English law governs substantive matters in the case.  In some contract cases, New York choice of law principles require an "interest analysis" that looks to the "law of the jurisdiction having the greatest interest in the litigation."  *See, e.g., Wm. Passalacqua Builders, Inc. v. Resnick Developers So., Inc.*, 933 F.2d 131, 137 (2d Cir. 1991) (citations omitted).  But in this case, the issue is straightforward because the contract contains a choice of law clause.  The Second Circuit has explained: "New York law is unambiguous in the area of express choice of law provisions in a contract.  Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction."  *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) (quotations and citations omitted).

Applying these principles, in the case at bar a New York court would recognize and enforce the choice of law selection in the contracts between RLS and UBK.  There is no issue of fraud or violation of public policy.  England has sufficient contacts with the transaction because the contract involved a London-based company.  Thus, the choice of law clause means that English law will govern substantive matters in this case.[7]  I now turn to whether these substantive matters include the English rule on attorneys' fees.

**D.     Substance and Procedure under New York Choice of Law Principles**

Under New York choice of law principles, contractual choice of law clauses only apply to substantive issues; New York will follow its own procedural rules.  The Second Department of the

---

[7] This result is supported by *Katz v. Berisford Int'l PLC*, 2000 WL 959721 (S.D.N.Y. July 10, 2000), where the court applied New York choice of law analysis and concluded that a contract clause selecting English law would be recognized.

Appellate Division of New York has explained: "Under common law rules matters of procedure are governed by the law of the forum.  On the other hand, matters of substantive law fall within the course chartered by choice of law analysis.  New York courts therefore apply contractual choice of law clauses only to substantive issues." *Educ. Res. Inst., Inc. v. Piazza*, 794 N.Y.S.2d 65, 66 (App. Div. 2d Dep't 2005) (quotations and citations omitted).  The New York Court of Appeals has retained the traditional substantive-procedural framework despite some criticism of this method of analysis.[8]

Thus, the Court must determine whether a New York court would consider the English rule on attorneys' fees a matter of substance or procedure for the purpose of its choice of law analysis. This determination is distinct from whether a rule is substantive or procedural under the *Erie* doctrine because the terms "substantive" and "procedural" can have different meanings in different contexts.  *See Hanna v. Plumer*, 380 U.S. 460, 471 (1965) ("The line between 'substance' and 'procedure' shifts as the legal context changes.  Each implies different variables depending upon the particular problem for which it is used.") A rule may be substantive for purposes of *Erie* analysis, but procedural under a state's choice of law analysis.[9]

---

[8] The Court of Appeals has explained: "It is worth noting that some criticism has been directed at the traditional analytic process that probes whether a particular statute erects procedural or substantive barriers for choice of law purposes.  Indeed, the Restatement (Second) of the Conflict of Laws, as amended in 1988, recommends the abandonment of this distinction as an analytic method.  . . . .  Ultimately, we are not persuaded to discard the traditional analytic framework for resolving disputes of this kind, particularly in light of the parties' strategic litigation course which frames the arguments around that usual format."  *Tanges v. Heidelberg N. Am., Inc.*, 93 N.Y.2d 48, 58-59 (1999) (citations omitted).

[9] *See, e.g., Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988) (rejecting notion that "there is an equivalence between what is substantive under the *Erie* doctrine and what is substantive for purposes of conflict of laws"); 17A James Wm. Moore et al., *Moore's Federal Practice* § 124.30[4] (3d ed. 2005) ("The distinction between procedure and substance under state choice of

In addition, whether *English law* consider attorneys' fees procedural is not controlling; the issue is whether the English rule would be considered procedural under *New York law*.  The New York Court of Appeals has clearly articulated this distinction:

> [P]laintiff urges that New York should . . . categorize section 52-577a [a Connecticut statute establishing time limits for product liability claims] as procedural because the Supreme Court of Connecticut has indicated that it considers its State's enactment as procedural in nature.  Though this designation is instructive and should not be ignored, plaintiff's proffer fails to come to grips with the basic precept that the law of the forum normally determines for itself whether a given question is one of substance or procedure. . . .
>
> Because New York is the forum State, we must look to New York choice of law rules to determine whether the nature and effect of Connecticut General Statutes § 52-577a is procedural or substantive.  New York is not bound by, and principles of comity do not prompt this Court to adopt, the choice of law classification that the Supreme Court of Connecticut may have selected for section 52-577a.

*Tanges v. Heidelberg N. Am., Inc.*, 93 N.Y.2d 48, 54 (1999) (quotations and citations omitted). Thus, RLS's observation that attorneys' fees are considered procedural under English law does not resolve the question at hand.

### 1.     RLS's Arguments Based on Second Circuit Case Law

RLS argues that the English rule should be considered procedural under *Conte v. Flota Mercante del Estado*, 277 F.2d 664 (2d Cir. 1960), and *Bensen v. American Ultramar Ltd.*, 1997 WL 317343 (S.D.N.Y. June 12, 1997).  However, these cases are not directly on point because they involve application of the English rule under different circumstances from the case at hand.

### (a)     *Conte v. Flota Mercante del Estado*

Plaintiff argues that "application [of the English rule] is barred in this Circuit by *Conte v. Flota Mercante del Estado*, 277 F.2d 664 (2d Cir. 1960)."  Pl.'s Mem. of Law in Opp'n to UBK's

law rules is not the same as under the *Erie* doctrine.").

Mot. to Dismiss (dated June 9, 2006), at 17.  In *Conte*, the Second Circuit refused to apply an

Argentine attorneys' fees statute that followed the English rule in an admiralty case with claims

governed by Argentine law.  The court reasoned:

> If provision for recovery of counsel fees had been made in an Argentine statute
> outlining the elements compensable in seamen's or perhaps in all personal injury
> actions, we should doubtless give effect to this as an integral part of the claim; but
> here the provision is a general one and is not even in the Civil Code which creates
> the right of action for tort but in the Code of Civil and Commercial Procedure. . . .
> [N]o authority is needed for the proposition that a court will tax ordinary court costs
> in accordance with its own practice rather than that of the state where the claim arose.
> A similar rule has been applied as to the fees of a guardian ad litem. . . .  We think
> the same rule should govern with respect to the fees of counsel, also officers of the
> court. . . . [T]he American practice of generally not including counsel fees in costs
> was a deliberate departure from the English practice, stemming initially from the
> colonies' distrust of lawyers and continued because of a belief that the English
> system favored the wealthy and unduly penalized the losing party.  On a matter so
> intimately related to judicial administration the forum will follow its own policy.

*Conte*, 277 F.2d at 672.

But *Conte* was an admiralty torts case that did not "consider the appropriate choice-of-law

analysis to be applied under New York law to the issue of attorneys' fees in the face of a contractual

choice-of-law clause."  *Katz v. Berisford Int'l PLC*, 2000 WL 959721, at *9 n.4 (S.D.N.Y. July 10,

2000) (distinguishing *Conte*).  *Conte* did not analyze the issue from the perspective of a New York

state court, as would be required in a diversity case.  Thus, the reasoning in *Conte* may be considered

for its persuasive force; but the case is not directly on point and does not control the result in the case

at hand.

       **(b)**    ***Bensen v. American Ultramar Ltd.***

Judge Buchwald analyzed the precise issue of whether the English rule on attorneys' fees

would be considered procedural or substantive under New York choice of law rules in *Bensen v.*

*American Ultramar Ltd.*, 1997 WL 317343 (S.D.N.Y. June 12, 1997).  Noting that "there [was] no New York case law directly on point," the court "consider[ed] the policy behind the traditional substance/procedure distinction" and concluded:

> In this context, we think it is clear that New York law concerning the availability of attorney's fees should be considered procedural.  In New York, the American rule is applied to every case, regardless of subject matter, unless an exception is specified by statute or contract.  It is a fundamental part of the framework of litigation in the state, relied on by litigants and counsel as a matter of course.

*Id.* at *13.  The Court cited Judge Friendly's analysis in *Conte v. Flota Mercante del Estado* to support its conclusion that "counsel fees, especially in the context of an attempted application of the English rule, must be deemed a matter of judicial administration."  *Id.* at *14.  Judge Buchwald noted that courts in a number of other jurisdictions — New Jersey, Idaho, Alaska, Delaware, Nebraska, and Arkansas — had classified attorneys' fees provisions as procedural.  *Id.*  The court concluded:

> [W]e are convinced that a New York court would not import the English rule to award attorneys' fees when they would not otherwise be available.  A New York court would consider the application of the American rule to be a fundamental component of the state's procedural law, and would apply it in the interests of predictability, fairness, and efficient judicial administration.

*Id.* at *15.

But the facts in *Bensen* are significantly different from those in the case at hand.  In *Bensen*, the defendant attempted to apply the English rule to recover attorneys' fees for a single, non-compulsory counterclaim that it asserted under English law.  The main claim in the case was brought under New York law.  Judge Buchwald distinguished other cases where the English rule had been applied — *Csaky v. Meyer*, 1995 WL 494574 (S.D.N.Y. Aug. 18, 1995) and *J. Barbour & Sons, Ltd. v. Taftco, Inc.*, 1989 WL 49518 (E.D. Pa. May 8, 1989) — on the grounds that those cases "involved

14

contract disputes in which the parties' contract was governed by English law, or in which the parties had designated English law in a choice of law clause." *Bensen*, 1997 WL 317343, at *10.  The *Bensen* case had "proceeded through the trial phase under the assumption that the American rule applied" until the defendant raised the issue "five years into the litigation."  *Id.* at *9.  The court noted that "applying the English rule would be wholly inconsistent with the parties' justified expectations and would produce an unpredictable result."  *Id.*

In the case at bar, RLS and the Bank entered into a contract governed by English law and both assumed, well into the litigation, that the English rule on attorneys' fees would apply.  Under these circumstances, the *Bensen* court's desire to promote "predictability" and "fairness" would seem to suggest the opposite result — that attorneys' fees should be considered substantive.

Thus, I find that *Conte* and *Bensen* are distinguishable from the case at hand, and undertake a *de novo* analysis of whether the English rule should be considered substantive or procedural.

### 2.     General Principles of New York Substance-Procedure Analysis

As *Bensen* noted, no New York case has directly addressed whether attorneys' fees should be considered substantive or procedural.  Thus, I turn to general principles of substance-procedure analysis followed by New York courts in the choice of law context.  Under New York choice of law principles, courts analyze substance-procedure classifications primarily based on a common law distinction between right and remedy.  *See Tanges v. Heidelberg N. Am., Inc.*, 93 N.Y.2d 48, 54-58 (1999).  Courts also consider policy concerns underlying the substance-procedure dichotomy.  *See id.* at 58.

#### (a)     Common Law Distinction

New York courts analyze substance and procedure in terms of the common law distinction

between "right" and "remedy." The New York Court of Appeals' latest thorough discussion of substance and procedure in the choice of law context — in *Tanges v. Heidelberg North America, Inc.*, 93 N.Y.2d 48 (1999) — illustrates this approach.[10] In *Tanges*, the court reasoned that a statute of limitations is considered procedural because it "does not extinguish the underlying right, but merely bars the remedy." *Id.* at 55. On the other hand, the court observed that statutes of repose[11] are considered substantive because they can "practically block[] causes of action before they even accrue" and "envelop both the right and the remedy." *Id.* at 56. The court concluded that a Connecticut statute, which established time limits as part of a comprehensive statutory scheme for products liability, was substantive because it was "so inextricably linked and integrated into the exclusive statutory cause of action as to warrant saying that it qualified the right to bring that kind of action." *Id.* at 58 (quotations and citation omitted).

Thus, New York courts appear to recognize the following distinction between substance and procedure: (1) issues of substance relate closely to the nature and existence of an underlying right, while (2) issues of procedure deal with the remedy, or the means by which the right is enforced.

At first glance, the English rule on attorneys' fees may appear procedural because it deals with the means by which the right is enforced. Attorneys generate their fees through the process of litigation, which is the method by which parties enforce their rights and defend themselves against claims. Moreover, the English rule is a general rule that applies to all claims under English law,

---

[10] *Tanges* involved time bar, and some of the court's discussion is specific to that context. But the court's approach also provides general guidance on substance-procedure classification under New York choice of law principles.

[11] A statute of repose is a time limitation that "begins to run when a specified event takes place, regardless of whether a potential claim has accrued or . . . whether any injury has occurred." *Id.* at 55.

16

rather than a specific rule attached to a particular cause of action. This suggests that the English rule simply operates as part of the general framework for how litigation is conducted. *See Conte,* 277 F.2d at 672; *Bensen,* 1997 WL 317343, at *14 n.35 (drawing distinction between general and specific attorneys' fees rules).[12]

But I conclude that the English rule on attorneys' fees is substantive because it involves much more than the mere process of litigation. The English rule effectively grants certain *substantive* rights to the parties in any litigation under English law. In essence, the English rule creates a quasi-right of action for "wrongful" legal costs.[13] The prevailing plaintiff enjoys a right to recover attorneys' fees for having needed to vindicate her rights through litigation — because the defendant did not immediately settle.[14] The prevailing defendant enjoys a right to recover attorneys' fees for

---

[12] In *Tanges*, the Court of Appeals applied a specificity principle to its substance-procedure analysis of time limits. The court stated that a time limit would be considered substantive if it were directly built into a statutory cause of action or if "it was directed to the newly-created liability so specifically as to warrant saying that it qualified the right." *Tanges*, 93 N.Y.2d at 56 (quotations and citations omitted). RLS essentially seeks to extend this specificity principle from time limits to attorneys' fees. I reject this extension because, as explained in text, the English rule on attorneys' fees involves substantive rights notwithstanding its general character.

[13] For the purposes of this quasi-right, "wrongful" is measured from an *ex post* rather than *ex ante* perspective. In other words, the plaintiff's imposition of legal costs on the defendant is considered wrongful if the plaintiff ultimately loses the case. Similarly, the defendant's failure to immediately settle is considered wrongful if the plaintiff ultimately prevails in the case.

[14] The plaintiff's quasi-right for attorneys' fees is somewhat analogous to prejudgment interest. Prejudgment interest increases the successful plaintiff's recovery amount to account for the time-value of money associated with the length of time it took the plaintiff to vindicate her rights through litigation. In a similar way, attorneys' fees for the plaintiff increase the successful plaintiff's recovery to account for the attorney costs needed to vindicate her rights through litigation. Pre-judgment interest is considered "substantive" under New York law. *See, e.g.*, *Davenport v. Webb*, 11 N.Y.2d 392 (1962) (treating prejudgment interest as substantive in wrongful death action); *Entron, Inc. v. Affiliated FM Ins. Co.*, 578 F. Supp. 334, 335 (E.D.N.Y. 1984) (treating prejudgment interest as substantive in contract case applying New York choice of

having been dragged into court to defend herself — against a claim that the plaintiff should not have brought. These quasi-rights of action, which are created by the English rule for attorneys' fees, accompany every cause of action under English law.[15] They fundamentally change the nature of each cause of action, which is conditioned, qualified, and amplified by these quasi-rights. Due to the risks and rewards created by these quasi-rights, a breach of contract action under English law is fundamentally different from one under American law. For these reasons, the English rule should be considered substantive under New York's common law framework for substance and procedure.

### (b)    Policy Considerations

New York courts also take into account policy considerations that underlie the substance-procedure distinction. These policy concerns relate to: (1) judicial efficiency, (2) forum-shopping, (3) fairness to the parties, and (4) New York public policy. *See Tanges v. Heidelberg N. Am., Inc.*, 93 N.Y.2d 48, 58 (1999).[16]

Applying the English rule to this case could impair judicial efficiency — as the Court would

---

law principles).

[15] In a sense, these quasi-rights can be thought of as additional claims and counterclaims that accompany each action under English law.

[16] In *Tanges*, the Court of Appeals stated: "As part of this Court's role in assessing this matter, however, we must also ask ourselves whether our deeming the Connecticut statute as substantive treads on any policy considerations which may underlie the procedural-substantive law dichotomy. . . . [T]he relevant policy concerns support our analysis and convince us to dub section 52-577a as substantive. Definitively declaring the law of New York State so that New York courts, and Federal courts operating under the diversity regimen, must apply section 52-577a as part of the substantive law of Connecticut does not impose a burden on those courts; nor does it threaten to delay the conduct of judicial business and impair judicial efficiency. Rather, the approach we adopt should help to discourage forum shopping, and may improve judicial efficiency and provide fair, even-handed justice to all parties. By directing the application of section 52-577a in cases like this one, we do not transgress or threaten public policy facets of New York as the forum State." *Id.* (quotations and citations omitted).

18

have to determine the amount of fees to be awarded under English law.[17]   However, several other policy factors strongly support use of the English rule.  First, failure to apply the English rule on attorneys' fees to contracts governed by English law would create strong incentives for forum-shopping.  Second, failure to apply the English rule would be unfair because it would be inconsistent with the parties' expectations.  RLS and the Bank entered into a contract governed by English law and both assumed, well into the litigation, that the English rule on attorneys' fees would apply. Finally, an award of attorneys' fees under the English rule would not appear to violate critical public policy interests of New York — especially considering that a prevailing party may recover attorneys' fees under New York law if there is a specific contractual right to such fees.  *See, e.g.*, *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 n.2 (1989) (contractual provisions allowing prevailing parties to collect attorneys' fees are "enforceable if they are not unconscionable").  *See also Browne v. Prentice Dry Goods, Inc.*, 1986 WL 6496, at *3 (S.D.N.Y. June 5, 1986) ("While it is true that under the so-called 'American Rule' attorneys' fees are not awarded to the successful litigant, this does not mean that an award of attorneys' fees under the 'English Rule' . . . is repugnant to the policy of New York State.").  Thus, a balance of the relevant policy considerations also weighs in favor of applying the English rule in this case.

For these reasons, I find that the English rule would be considered substantive under New York choice of law principles.  Thus, the contract clause selecting English law incorporates the

---

[17] An award of attorneys' fees under English law involves a potentially complex assessment by a "taxing master."  *See RLS Assocs., LLC v. United Bank of Kuwait PLC*, 2005 WL 578917, at *4-5 (S.D.N.Y. Mar. 11, 2005).  But this concern is somewhat reduced in this case because the Bank already prepared (and the Court already reviewed) a detailed preliminary estimate of the attorneys' fees that UBK would recover under English law if it prevailed.  *See* 2005 WL 3312004 (S.D.N.Y. Dec. 7, 2005).

English rule on attorneys' fees, and the prevailing party in this litigation will be entitled to recover such fees.

## III.  SHOULD THE COURT REQUIRE A BOND?

### A.      Background

The Court's March 11, 2005 Opinion found that a security bond was warranted under Local Civil Rule 54.2 because RLS appeared unable to pay potentially significant costs and fees due to the Bank if the Bank prevailed in the litigation.  *See* 2005 WL 578917, at *4 (S.D.N.Y. Mar. 11, 2005).  RLS argues that a bond should not have been required because other relevant factors weighed against a bond, and "there is no case that holds that the ability to pay alone can outweigh all other factors that weigh against a bond."  Pl.'s Mem. of Law in Opp'n to UBK's Mot. To Dismiss (dated June 9, 2006), at 5.  Furthermore, RLS argues that a bond is no longer warranted because the Bank has refused settlement offers that would have completely eliminated the Bank's risk of paying costs and fees to RLS.  In light of these arguments, the Court reconsiders whether a bond is justified under Rule 54.2.

### B.      Rule 54.2 Standards

Local Civil Rule 54.2 provides that "[t]he court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate."   Courts have recognized a number of relevant factors for determining whether to require a party to file a bond: "(1) the financial condition and ability to pay of the party who would post the bond, (2) whether the party is a non-resident or foreign corporation, (3) the merits of the underlying claims, (4) the extent and scope of discovery, (5) the legal costs expected to be incurred, and (6) compliance with past court orders."  *RLS Assocs., LLC v. United*

20

*Bank of Kuwait PLC*, 2005 WL 578917, at *1 (S.D.N.Y. Mar. 11, 2005) (citations omitted).  The

district court's bond determination is "an exercise with equitable as well as legal implications."  *RLS*

*Assocs., LLC v. United Bank of Kuwait PLC*, 2006 WL 2019576, at *3 (S.D.N.Y. July 13, 2006).

**C.     Analysis**

> **1.     The Court's Previous Analysis**

The Court's March 11, 2005 Opinion recognized that several factors weighed against a bond

requirement.  The Court found that: "At the outset, three of these factors appear to militate *against*

requiring a bond.  Plaintiff is not a non-resident or foreign corporation, there is no history of

noncompliance with prior orders, and the extent and scope of discovery in this case, while perhaps

extensive, is not particularly unusual in its magnitude."  2005 WL 578917, at *1 (S.D.N.Y. Mar. 11,

2005).  Furthermore, the Court noted that RLS's claims are not of dubious merit, which also weighs

against a bond order.[18]  *Id.* at *3.  Nonetheless, the Court concluded that RLS's inability to pay

potentially significant costs and fees justified a bond:

> A balancing of the relevant factors persuades the Court that in this case, UBK has
> shown that in principle it is entitled to the protection of a bond to be posted by RLS.
> As noted, on the present record UBK has a justified concern about RLS's financial
> ability to pay UBK's costs if UBK prevails after trial.  Moreover, since the English
> Rule applies, attorneys' fees are included in the recoverable costs, and so the amount
> involved is potentially significant.

*Id.* at *4.  RLS's inability to pay created an unfair asymmetry in the litigation.  If RLS prevailed, it

could obtain attorneys' fees and costs from UBK.  But if UBK prevailed, it would not be able to

recover costs and fees due to RLS's lack of funds.

---

[18] In fact, the Second Circuit has held that the plaintiff has a potentially meritorious claim.
*RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704 (2d Cir. 2004).  The Second
Circuit reversed this Court's grant of summary judgment for UBK and held that the contract
providing for a post-termination fee was supported by valid consideration.  *Id.* at 709-12.

21

Despite the fact that RLS's underlying claim is potentially meritorious and that a majority of the relevant factors counsel against a bond, I adhere to my earlier conclusion that RLS's undisputed — indeed, self-proclaimed — lack of assets furnishes a sufficient basis for compelling the pretrial posting of a bond in a fair and appropriate amount.  As the Court previously noted, "there is authority for the proposition that a party's apparent financial inability to pay prospective costs is sufficient in and of itself to justify an order requiring the posting of a cost bond under Rule 54.2." 2005 WL 578917, at *4 (S.D.N.Y. Mar. 11, 2005) (citing *Knight v. H.E. Yerkes & Assocs., Inc.*, 675 F. Supp. 139 (S.D.N.Y. 1987)).  Moreover, the litigation asymmetry created by RLS's inability to pay provides a strong equitable justification for a bond requirement.

### 2.   UBK's Refusal To Settle

In an August 22, 2006 submission to the Court, RLS argued that a security bond was no longer warranted because: "RLS has offered UBK to abandon its claims, provided the parties exchange mutual releases, and UBK has rejected this offer.  We respectfully submit that . . . the current equities demonstrate that UBK neither needs nor is entitled to protection in the form of security for its attorneys' fees and costs."  Affirmation of Michael S. Devorkin in Supp. of Pl.'s Mot. To Set a Trial Date Without Security from RLS, and To Require Def. To Post Security Under Local Rule 54.2 (dated Aug. 22, 2006), at 2.

UBK could have eliminated its risk of paying RLS's breach of contract claim, augmented by RLS's costs and attorneys' fees under the English  rule, by accepting that settlement offer, thereby placing the parties — in one sense — on equal footing.  But UBK was entitled to choose the risks and rewards of proceeding with the case rather than the protection of a settlement.  Under these circumstances, a bond is still appropriate to protect UBK's legitimate interest in recovering costs and

fees if it prevails in the litigation.[19]

## IV.  APPROPRIATE BOND AMOUNT

The district court enjoys considerable discretion in setting a bond amount under Rule 54.2. *See* S.D.N.Y. Local Civ. R. 54.2 ("The court . . . may order any party to file an original bond for costs or additional security for costs in such an amount . . . as it may designate."). Under *Selletti v. Carey*, 173 F.3d 104 (2d Cir. 1999), however, the district court may not dismiss an action for failure to post a bond without considering the plaintiff's inability to pay.  Thus, a court should not impose a bond that a party is unable to pay.  Subject to this requirement, the amount of the bond lies within the district court's discretion, informed by both legal and equitable considerations.

In its December 7, 2005 Opinion, the Court set the bond amount at $469,500.  *See* 2005 WL 3312004, at *2 (S.D.N.Y. Dec. 7, 2005).  This amount was based on an estimate of the costs and fees that would be awarded to UBK under English law and practice if UBK prevailed at trial.  The Court now reconsiders that bond amount.  The Court first determines whether the bond requirement may reach beyond the corporate plaintiff, RLS, to Richard Swomley or Elaine Swomley.  Second, the Court revisits the bond amount in light of the competing equitable interests at stake, including RLS's interest in proceeding to trial on a potentially meritorious claim.

---

[19] However, RLS has a legitimate concern that UBK is using the bond requirement to impose severe financial burdens on the Swomleys and to prevent the trial from occurring.  Such a maneuver would be a strong strategic move on UBK's part.  If the case is dismissed for RLS's failure to post a bond, UBK could then assert a claim to recover its costs and fees (assuming without deciding that a dismissal for failure to post a bond would qualify UBK as a party prevailing on the merits under the English rule).  The Court will address this concern, however, by setting a bond amount that does not prevent, or effectively prevent, RLS from proceeding to trial on its case.

**A.       The Corporate Plaintiff's Inability to Pay**

RLS argues that a bond was inappropriate under *Selletti* because "RLS is not financially able to post security."  Pl.'s Mem. of Law in Opp'n to UBK's Mot. To Dismiss (dated June 9, 2006), at 9.  Essentially, RLS argues that the bond amount must be set at $0 — notwithstanding the justifications for a bond described above.  This issue turns on consideration of whether the bond requirement should reach beyond the non-existent assets of the corporate plaintiff, RLS, to the assets of Richard Swomley or Elaine Swomley.

The strongest argument for restricting the bond requirement to RLS is that the Court should respect the limited liability corporate form.  RLS is a limited liability company, organized under the laws of Connecticut.  This corporate status is intended to allow entrepreneurs to pursue business opportunities while limiting the liability of individual members.  Requiring the Swomleys to post the bond on behalf of RLS undercuts this policy.  Furthermore, the Bank entered into a contract with "RLS Associates, LLC" — *not* with Richard Swomley or Elaine Swomley — and the Bank should have known that its potential recovery against the company was limited to the company's assets.  If UBK wants to reach the assets of the Swomleys, the argument goes, the Bank should have to pierce the corporate veil of RLS.[20]

However, Rule 54.2 bond analysis and corporate veil-piercing analysis arise in different contexts.  Corporate veil-piercing deals with whether a member of a company may be held liable for the debts and obligations of the company.  In other words, the corporate form allows members of a

---

[20] UBK has claimed, in somewhat cursory fashion, that RLS is "a corporate shell that ha[s] been stripped of its assets by shareholders."  Def.'s Reply Mem. in Supp. of Mot. To Dismiss with Prejudice (dated June 26, 2006), at 4.  But the Bank has not rigorously demonstrated that the corporate veil should be pierced in this case.

company to conduct business without fear of personal liability unless the corporate veil is pierced. In contrast, the bond requirement here deals with the obligations of company members to provide security for potential costs and fees incurred by the opposing party where the company has affirmatively brought a lawsuit seeking to obtain damages.  This latter inquiry involves equitable principles distinct from — though perhaps related to — piercing the corporate veil.

The situation at hand is somewhat complicated because corporate veil-piercing may potentially arise at a later stage in the litigation.  If UBK prevails in the case and obtains a judgment for costs and fees against RLS, it may seek to pierce the corporate veil and enforce that judgment against the Swomleys.  RLS could argue that allowing the bond amount to consider the Swomleys' assets effectively allows the Bank to bypass this veil-piercing procedure.  If UBK were to prevail in the litigation, UBK could obtain costs and fees from the Swomleys through the medium of the bond, even if UBK could not successfully pierce the corporate veil.

But this argument fails to recognize that the bond inquiry deals with RLS's desire to prosecute the case and obtain the fruits of litigation.  If RLS drops the case (or if it fails to post the bond and the case is dismissed), liability cannot be imposed against the Swomleys unless the Bank can successfully pierce the corporate veil.  Thus, RLS can retain the protections of the corporate veil by simply abandoning the lawsuit.  The bond will only bypass the Bank's need to pierce the corporate veil *if* RLS actively chooses to proceed with the action.

In the Rule 54.2 context, equitable principles suggest that the bond requirement may look beyond the corporate plaintiff to the real person in interest.  Richard Swomley is the sole member of RLS and, in a practical sense, he is the person who stands to gain if RLS prevails in the

litigation.[21]  Under these circumstances, it is appropriate to consider his assets in setting the bond amount.[22]

A brief hypothetical helps illustrate this point.  Suppose Richard Swomley had $100 million in assets.  In this scenario, it would be highly inequitable for Richard Swomley to object to the bond, under *Selletti*, on the grounds that RLS had no assets with which to post a bond and simply could not pay.  Of course, Richard Swomley does not actually have $100 million in assets.  But the point is that the Court's equitable inquiry, and the appropriate bond amount, should take into account what assets Richard Swomley *does* possess.  Whether Richard Swomley holds $100 million or $100,000 in assets seems relevant to the equitable inquiry at hand.

Thus, I conclude that the bond requirement may look beyond the corporate plaintiff, RLS, to the assets of Richard Swomley, the beneficial owner of RLS's claim against the Bank.

## B.    Appropriate Bond Amount in Light of Competing Equitable Interests

As noted above, the Bank has a legitimate interest in recovering costs and fees if it prevails in the litigation.  But this is not the only equitable factor relevant to the bond amount.  RLS has a legitimate interest in obtaining its day in court on a claim whose potential merit has been attested to,

---

[21] On the other hand, I conclude that Elaine Swomley's assets should not be considered. Although she will presumably stand to gain if RLS prevails in the litigation, her connection to RLS is tenuous.  Plaintiff's submissions indicate that Elaine Swomley was a 1% member of RLS until 1999, when she withdrew as a member.  Affirmation of Michael S. Devorkin To File Financial Statements of RLS Associates, LLC, Richard Swomley, Elaine Swomley (dated Sept. 14, 2006), Ex. 3, at 3-4.

[22] This result is supported by *Tri-Ex Enters., Inc. v. Morgan Guar. Trust Co.*, 1985 WL 144 (S.D.N.Y. Jan. 11, 1985).  *Tri-Ex* involved a suit brought by a dissolved corporation with no funds or assets.  The court found "little merit in [the] self-defeating argument" that the bond motion should be denied because Tri-Ex had no funds with which to post a bond.  *Id.* at *1. Instead, the court found that the bond requirement extended to the company's principals, who had been financing the litigation (and presumably stood to benefit if Tri-Ex prevailed).

26

at least in part, by the Second Circuit.

In that regard, it is useful to consider in greater detail the Second Circuit's opinion, *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704 (2d Cir. 2004), which vacated this Court's summary judgment in UBK's favor and with which the reader's familiarity is assumed. Before this Court the Bank urged three grounds for summary judgment: (1) the "November Amendment" (the document creating RLS's right to post-termination commissions) was void for lack of consideration, *see* 380 F.3d at 707-12; (2) the November Amendment was invalid under the terms of the original Consultancy Agreements because it was not signed by the Asset Managers, *id.* at 712; and (3) RLS's interpretation of the November Amendment would impermissibly impose obligations on the Asset Managers without their assent, *id.* at 713. I rejected the second and third grounds, but granted UBK summary judgment because, endeavoring to apply English law, I held that the November Amendment was unenforceable because of a total lack of consideration. On appeal the Second Circuit, applying English law, reversed that holding, concluding that an obligation falling upon RLS under the November Amendment to render assistance in finding a replacement consultant, if requested by UBK, "satisfies the consideration requirement." *Id.* at 712 (footnote omitted). That is an appellate conclusion of law, constitutes the law of the case, and precludes counsel for UBK at trial from arguing the issue of consideration to the jury or asking for an instruction by the Court on the subject. As for UBK's second ground, the Second Circuit affirmed this Court's finding of contractual ambiguity "as to whether the signature of the Asset Managers would be required for modification that did not affect the Asset Managers' obligations," *id.*, thereby precluding summary disposition, but went on to note that "other passages appear to contemplate treating only RLS and UBK as parties with rights under the contract," *id.*, which does not make

27

encouraging reading for UBK.  As for UBK's third ground, the Second Circuit stated unequivocally

that "the November Amendment did not impose obligations on the Asset Managers to which they

had not consented," *id.* at 713, a further appellate holding that precludes UBK from arguing

otherwise at the trial.

The upshot of all this is that RLS will come to trial with two key contractual issues already

decided in its favor by the Second Circuit, and the odds seemingly in its favor on a third.[23]  I think

that RLS's favorable trial prospects must be factored into the amount of the bond RLS should be

required to post to secure UBK for payment of its attorneys' fees in the event that UBK, contrary to

these indications, prevails at trial.  It is one thing to require full costs security for a defendant from

a plaintiff whose implausible and farfetched claim is nonetheless immune from dismissal or

summary disposition and must be tried.[24]  It is quite another to require such security from a plaintiff

whose claim has already been significantly tested in the appellate fire, particularly where a compelled

posting of full security risks denying the plaintiff its day in court.

If objection be made that factoring the likelihood of success into the amount of a security

bond constitutes improper prejudging of the merits of litigation, the answer (quite apart from the

Second Circuit's rulings favoring plaintiff in the case at bar) is that such an exercise is inherent in

---

[23] In addition, UBK advances a separate argument that RLS is not entitled to post-termination commissions because Richard Swomley allegedly made statements prejudicial to the interests of UBK.  This Court declined to grant UBK summary judgment on this ground, holding that the issue was "a fact-intensive question appropriate for jury resolution."  *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 2003 WL 22251332, at *7 (S.D.N.Y. Sept. 30, 2003).  UBK did not appeal that holding.  At the trial, UBK will bear the burden of proof on this affirmative defense.

[24] *See. e.g., Bressler v. Liebman*, No. 96 Civ. 9310, 1997 WL 466553 (S.D.N.Y. Aug. 14, 1997), at *4 ("Where the merits of plaintiff's case are questionable, security bonds are considered appropriate.") (citations and internal quotation marks omitted).

any fixing of security for costs by a district court. The merits of the underlying claims are routinely considered in determining *whether* to require a bond under Rule 54.2, and there is no reason why this factor may not also affect the *amount* of the bond. *Cf. Adsani v. Miller*, 139 F.3d 67, 79 (2d Cir. 1998) (affirming the district court's requiring the posting of a $35,000 bond under Fed. R. App. P. 7 pending the outcome of plaintiff's appeal) ("A district court, familiar with the contours of the case appealed, has the discretion to impose a bond which reflects its determination of the likely outcome of the appeal.") (citation omitted).

Thus, the Court must set a bond amount that provides some protection to UBK for its costs and fees without seriously impeding the plaintiff's ability to prosecute the action. In the exercise of its equitable discretion, the Court determines that a bond amount of $75,000 will properly balance the competing equitable interests at stake. I assume for purposes of this analysis that RLS and Richard Swomley will have to collateralize 100% of that amount in order to obtain a bond from a surety company acceptable to the Clerk of the Court (who maintains a list of such companies). But Richard Swomley controls assets in a sufficient amount to work out an arrangement with a surety company to meet this requirement.

## C.    RLS's Bond Request

Finally, RLS urges the Court to require UBK to post security under Rule 54.2. RLS notes that "it has been unable to find any evidence that UBK is operating today in the United States or has any assets here from which RLS could collect any attorneys' fees and expenses to which it may be entitled . . . in the event it is successful." Affirmation of Michael S. Devorkin in Supp. of Pl.'s Mot. To Set a Trial Date Without Security from RLS, and To Require Def. To Post Security Under Local Rule 54.2 (dated Aug. 22, 2006), at 7. The Bank is a foreign corporation, and RLS has expressed

29

some legitimate concern about its ability to collect potential costs and fees.  Furthermore, the Bank

stated in response to plaintiff's bond motion: "[T]o avoid further costly litigation, and place the

parties on equal footing under the contract, if plaintiff posts the bond required in the December 7,

2005 order, the Bank agrees to provide security for the fees RLS would be required to pay pursuant

to its contingency agreement." Def.'s Mem. in Resp. to Financial Disclosures (dated Sept. 27, 2006),

at 8.

I conclude that UBK should also be required to post a bond under Rule 54.2.  The original

equitable justification behind the bond (to be posted by RLS) involved the litigation asymmetry

created by RLS's inability to pay.  This symmetry principle would be served by requiring both parties

to post a bond for $75,000 under Rule 54.2.  Under this arrangement, the prevailing party — whether

RLS or the Bank — will be assured of recovering $75,000 towards the amount owing to it.[25]  This

approach places  the parties on equal footing.  Moreover, equity requires that the plaintiff have some

measure of security for its recovery if the trial results in a judgment in its favor.  The amount of that

judgment could be considerable.   RLS's breach of contract claim amounts to several hundred

thousand dollars, to which pre-judgment interest may be added,[26] together with costs and its attorneys'

fees under the English rule.  A judgment in plaintiff's favor would carry statutory post-judgment

interest until the judgment is paid (after appeals, if any).  One assumes, or certainly hopes, that UBK

would act honorably and promptly pay a final judgment entered against it by an American court, even

---

[25] To obtain the full measure of costs and fees, UBK may have to pierce the corporate veil of RLS to reach the Swomleys' assets, while RLS may have to pursue the Bank's funds and assets held abroad.

[26]  I do not undertake in this Opinion to decide plaintiff's right to pre-judgment interest, or the rate thereof, if plaintiff prevails at trial on its breach of contract claim.

if the Bank has no assets in this country. But if the Bank fails to do so, the $75,000 bond required

by this Opinion and Order will help fund plaintiff's enforcement of its judgment in an English court,

where UBK can be found.[27]

## V. CONCLUSION

For the foregoing reasons, defendant UBK's motion to dismiss for plaintiff RLS's failure to

post the cost bond required by the Court's December 7, 2005 Opinion and Order is denied.

The Court directs plaintiff RLS and defendant UBK to each post a bond for costs in a form

acceptable to the Court in the amount of $75,000, within sixty (60) days of the date of entry of this

Opinion and Order.

The Court understands that the case is fully trial ready. If that is not the case, counsel are

directed to advise the Court in writing not later than fourteen (14) days from the date of entry of this

Opinion and Order.

As soon as both bonds are posted, the Court will conduct a conference and set a trial date.

It is SO ORDERED.

Dated: New York, New York
November 27, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[27] An English court, it is reasonable to assume, would be receptive to the enforcement of
an American judgment in a case governed by English law.

31